**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**HATTIESBURG DIVISION**

**JAMES D. HARRELL, IV, Individually and o/b/o**
**MY SOUTH FOODS, LLC; And DIFFERENT**
**DRUMMER MULTIMEDIA, LLC**                                       **PLAINTIFFS**

**VERSUS**                                       **CIVIL ACTION NO. 2:10cv173KS-MTP**

**ROBERT ST. JOHN; ROBERT ST. JOHN.com, LLC;**
**AND JOHN DOES I-V**                                       **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

This matter is before the court on a Motion for Summary Judgment **[#27]** filed on

behalf of the defendants, Robert St. John and Robert St. John.com, LLC.  The court,

having reviewed the motion, the response, the pleadings and exhibits on file and being

otherwise fully advised in the premises finds that the motion is well taken and should be

granted.  The court specifically finds as follows:

<u>**BACKGROUND**</u>

According to the allegations, defendant Robert St. John ("St. John")[1] is a local

restaurateur, chef, food writer, author, and a food/humor columnist.  For the last 23

years he has served as Executive Chef, president, and CEO of the Purple Parrot Café,

the Crescent City Grill, and the Mahogany Bar in Hattiesburg.  He is also the owner of

Different Drummer Publishing, which publishes his cookbooks, columns and articles

---

[1]  The court may sometimes refer to all defendants as simply "St. John" or "the defendants" for
brevity.

based upon southern life, humor and cuisine.  Over the years, St. John has been engaged in the wholesale and retail sales of various food products such as coatings, seasonings, and other products based upon his recipes used in his restaurants or published in his cookbooks.

Plaintiff, Jimmy Harrell, ("Harrell") is a former attorney who formed a corporation named Harrellco, Inc. and became successful providing labor on H-2B visas, for power line companies.  In 2006, St. John and Harrell became acquainted through their participation in weekly meetings of a "men's accountability group."  During the course of those meetings, St. John would sometimes mention business ideas he was pursuing and Harrell would often tell St. John that he would be interested in financially backing certain projects.  At some point, Harrell offered to invest $300,000 in one of St. John's ventures.

After multiple brainstorming sessions at St. John's office where they discussed many ideas, the parties embarked upon a project to produce and market a pilot cooking show for television syndication and to develop a national wholesale and retail market for both St. John's existing food products and new products.  It is alleged that the parties anticipated that, if successful, the television show and other marketing efforts would drive the demand for St. John's food products.

Harrell filed documents to form Different Drummer Ultramedia, LLC ("DDU")[2] on August 29, 2006 and appointed himself as Manager.  DDU was to produce and market

---

[2] One of the plaintiffs is listed as "Different Drummer Multimedia, LLC."  However, all of the parties refer to "Different Drummer Ultramedia, LLC" in their summary judgment papers and it will be addressed as such by the court..

the pilot cooking show for television syndication.  Harrell filed documents to form My South Foods, LLC ("MSF")[3] on April 20, 2007, again appointing himself as Manager. MSF was to market the food products.  Harrell agreed to contribute capital to both companies and St. John was to provide his time, his services and his expertise to assist in the marketing of his food products.

It is apparently undisputed that neither LLC had any written operating agreement or that both St. John and Harrell had equal managerial authority over the operations of the two LLCs.  However, Harrell appears to have controlled all bank accounts and financial affairs of both companies and wrote all of the checks.  St. John alleges that he never saw any of the MSF banking or corporate records.  He also contends that neither MSF nor DDU had any bank accounts and that the vast majority of the companies' expenses were paid out of the Harrellco checking account.

The parties hired Damion Michaels to help develop a comprehensive marketing program, develop the MSF web site, and develop the computer server platforms necessary to handle the commercial transactions.  Michaels had previously worked in the same capacity for Chef Emeril Lagasse for over eight years.  Michaels also worked on developing a separate Robert St. John.com website that was to host St. John's articles and anecdotes to improve MSF's web presence and drive traffic to the MSF website.  Harrell put Michaels on the Harrellco payroll at a salary of $4,800 per month plus health benefits for Michaels and his family.

St. John asserts that MSF began developing a catalog of food products.  Harrell

---

[3]  For brevity, all of the plaintiffs may sometimes be referred to simply as "Harrell" or "the plaintiffs" throughout this opinion.

counters that, in fact, a 20-page MSF Catalogue was fully developed and published, the copyright to which, along with other materials, has been assigned to MSF by written Transfer Agreement.  All of these products were either St. John's original recipes or belonged to "private label" companies who would manufacture their products for sale under the MSF or RSJ labels.  These were to be sold under both the "Robert St. John" label and under the "My South" labels.  Harrell has admitted there is nothing unique about the product names other than "My South" or "Robert St. John" names.

DDU subsequently produced two television pilot episodes entitled *Robert St. John is Eating the South*.  These were created to sell to a television network, not as retail DVD's.  Unfortunately DDU was not successful at marketing the television show. Consequently, there was little demand for the food products.  The parties began disagreeing on the progress of the ventures and the quality of the marketing materials. Harrell has testified that he was particularly concerned about the delay in getting the MSF website operational and getting products sold.

St. John contends that in late August 2007, Harrell walked into St. John's office and abruptly declared that "I'm bailing."  Supposedly, Stacey Andrews, a St. John employee, was also present.  However, Andrews does not remember this event exactly as described and Harrell vehemently denies it.  Nevertheless, St. John asserts that he was shocked and that he knew Harrell had been frustrated with the progress of the venture, but he had no idea that his concerns were that significant.  St. John alleges that he felt a moral obligation to help Harrell try to recover his investment and that he asked his attorney to try to reach an agreement with Harrell to settle the dissolution of the companies.  No agreement was ever reached.

-4-

Harrell argues that in August of 2007 St. John informed Harrell that he wanted to take full control of the ventures, that Harrell should itemize the sum of his investment, and that he, St. John, would reimburse Harrell the full amount of his investment. Harrell asserts the he learned for the first time through discovery herein that, about the same time, Damion Michaels, the web developer retained on behalf of MSF, sent an email to St. John and his counsel, suggesting that they take certain steps to proceed with the business ventures without Harrell's involvement, or even his knowledge, after offering Harrell the inventory of food products and computer equipment, all of which was purchased by Harrell on behalf of the plaintiff LLCs. Harrell alleges that soon afterwards, he was instructed by St. John's counsel not to further communicate directly with St. John, and thus was and has ever since been precluded from any further involvement in the operation of the ventures.

St. John contends that he attempted to continue operating My South Foods since food products had already been ordered, there was inventory that needed to be sold, debts to be paid, and the Christmas season was approaching. However, since St. John allegedly had no control over the non-existent MSF bank account, he set up a new bank account under that name. St. John took out a personal bank loan for $48,000.00 to pay the salary owed to Damion Michaels, the MSF website developer. St. John also put Michaels on his payroll so he could obtain health insurance for his family. St. John contends that he also paid many of the MSF bills with funds from his other companies. He alleges that MSF continued to lose money and after paying Michaels' back pay, it lost $72,309.59 in 2007.

St. John testified that after Harrell allegedly abandoned both companies, and

when it became apparent to St. John that the parties were not going to be able to agree on any plan for the dissolution of the companies, he became concerned that he should be protected from personal liability for MSF debts by doing business through a limited liability company.  Thus, on May 12, 2008, he formed a new limited liability company under the name "Robertstjohn.com, LLC," ("RSJ.com").  St. John contends that he did not have access to any of the MSF website materials so he hired another firm to create an entirely new website and began marketing food products to attempt to pay off the debts.  He further alleges that when RSJ.com discontinued operations in February 2011, it had cumulative losses of $127,443.01.39.

St. John argues that having made an unsuccessful business investment, Harrell now seeks to recoup his losses from his former business partner.  Harrell contends that St. John proceeded with the ventures after Harrell's "ouster," and never made any attempt to compensate Harrell or acknowledge his nearly $250,000 investment.  Harrell continues that St. John, through Robertstjohn.com, LLC usurped the business opportunity of My South Foods, LLC but stopped selling the food products as of January 31, 2011, as discovery in this litigation was being conducted.

## STANDARD OF REVIEW

The Federal Rules of Civil Procedure, Rule 56(c) authorizes summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FRCP 56(c); and *see Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986).  The existence of a

material question of fact is itself a question of law that the district court is bound to consider before granting summary judgment. *John v. State of La. (Bd. of T. for State C. & U.)*, 757 F.2d 698, 712 (5th Cir. 1985).

A Judge's function at the summary judgment stage is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986).

Although Rule 56 is peculiarly adapted to the disposition of legal questions, it is not limited to that role. *Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis*, 799 F.2d 218, 222 (5th Cir. 1986). "The mere existence of a disputed factual issue, therefore, does not foreclose summary judgment. The dispute must be genuine, and the facts must be material." *Id.* "With regard to 'materiality', only those disputes over facts that might affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment." *Phillips Oil Company v. OKC Corporation*, 812 F.2d 265, 272 (5th Cir. 1987). Where "the summary judgment evidence establishes that one of the essential elements of the plaintiff's cause of action does not exist as a matter of law, . . . all other contested issues of fact are rendered immaterial. *See Celotex*, 477 U.S. at 323, 106 S.Ct at 2552." *Topalian v. Ehrman*, 954 F.2d 1125, 1138 (5th Cir. 1992). In making its determinations of fact on a motion for summary judgment, the Court must view the evidence submitted by the parties in a light most favorable to the non-moving party. *McPherson v. Rankin*, 736 F.2d 175, 178 (5th Cir. 1984).

The moving party has the duty to demonstrate the lack of a genuine issue of material fact and the appropriateness of judgment as a matter of law to prevail on his motion.  *Union Planters Nat. Leasing v. Woods*, 687 F.2d 117 (5th Cir. 1982).  The movant accomplishes this by informing the court of the basis of its motion, and by identifying portions of the record which highlight the absence of genuine factual issues.  *Topalia*n, 954 F.2d at 1131.

"Rule 56 contemplates a shifting burden:  the nonmovant is under no obligation to respond unless the movant discharges [its] initial burden of demonstrating [entitlement to summary judgment]."  *John*, 757 F.2d at 708.  "Summary judgment cannot be supported solely on the ground that [plaintiff] failed to respond to defendants' motion for summary judgment," even in light of a Local Rule of the court mandating such for failure to respond to an opposed motion.  *Id.* at 709.

However, once a properly supported motion for summary judgment is presented, the nonmoving party must rebut with "significant probative" evidence.  *Ferguson v. National Broadcasting Co., Inc.*, 584 F.2d 111, 114 (5th Cir. 1978).  In other words, "the nonmoving litigant is required to bring forward 'significant probative evidence' demonstrating the existence of a triable issue of fact."  *In Re Municipal Bond Reporting Antitrust Lit.* , 672 F.2d 436, 440 (5th Cir. 1982).  To defend against a proper summary judgment motion, one may not rely on mere denial of material facts nor on unsworn allegations in the pleadings or arguments and assertions in briefs or legal memoranda. The nonmoving party's response, by affidavit or otherwise, must set forth specific facts showing that there is a genuine issue for trial.  Rule 56(e), Fed.R.Civ.P.  *See also, Union Planters Nat. Leasing v. Woods*, 687 F.2d at 119.

While generally "'[t]he burden to discover a genuine issue of fact is not on [the] court,' (*Topalian* 954 F.2d at 1137), 'Rule 56 does not distinguish between documents merely filed and those singled out by counsel for special attention-the court must consider both before granting a summary judgment.'"  *John*, 757 F.2d at 712 (quoting *Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406, 410 (5th Cir. 1980)).

## LAW AND ANALYSIS

Absent a written agreement to the contrary, one member of a limited liability company is not liable to other members for the loss of their investment.  Miss. Code Ann. § 79-29-305 (1) states that,

> A person who is a member of a limited liability company is not liable, by reason of being a member, under a judgment, decree or order of a court, or in any other manner, for a debt, obligation or liability of the limited liability company, whether arising in contract, tort or otherwise or for the acts or omissions of any other member, manager, agent or employee of the limited liability company.

Likewise, neither party in this case had any enforceable obligation to contribute any money or property to the LLC.  Miss. Code Ann. § 79-29-502 (1) states that, "A promise by a member to contribute to the limited liability company is not enforceable unless set out in a writing signed by the member."  Harrell admits that there was no written Operating Agreement for either LLC, nor was there any other written agreement that was signed by the parties obligating them to contribute money or property to the LLCs.

St. John argues that trying to circumvent the obvious portent of the foregoing, Harrell filed a suit in Lamar County Chancery Court asserting a variety of state law

claims including dissociation, accounting, injunctive relief, declaratory judgment, breach of fiduciary duty, embezzlement and conversion, tortious interference with business relations, contribution, fraud in the inducement, unfair competition, misappropriation of trade secrets, unjust enrichment, dissolution, and seizure of assets.  However, St. John correctly points out that at the core of each of those claims is the allegation that St. John agreed that he "would provide his services, copyrights, trademarks, recipes, talents and other assets" to the companies and that he "conveyed intellectual properties to the Companies, then … took control of the intellectual properties then owned by the Companies and converted same to his own use and benefit and to the use and benefit of RSJ, to the exclusion and detriment of Plaintiffs."

After the case was removed to this court, the plaintiffs filed an Amended Complaint asserting additional facts and causes of actions.  However, St. John contends that regardless of the labels applied or the legal theories employed, all of the plaintiffs' claims are based upon the same nucleus of allegations of "infringement or conversion of rights of the Plaintiffs in and to certain intellectual properties, including but not limited to trademarks and copyrights by robertstjohn.com, LLC, in violation of copyrights, trademarks and intellectual properties owned and/or licensed by the Plaintiff LLCs."

Thus, St. John first contends that Harrell's claims are preempted by the Copyright Act, 17 U.S.C. § 301, which states

> On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or

after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a).

The Notes of Committee on the Judiciary, House Report No. 94-1476, clearly express Congress' intent that the Copyright Act pre-empt state law claims and vest exclusive jurisdiction with the federal courts:

The intention of section 301 [this section] is to preempt and abolish any rights under the common law or statutes of a State that are equivalent to copyright and that extend to works coming within the scope of the Federal copyright law. The declaration of this principle in section 301 [this section] is intended to be stated in the clearest and most unequivocal language possible, so as to foreclose any conceivable misinterpretation of its unqualified intention that Congress shall act preemptively, and to avoid the development of any vague borderline areas between State and Federal protection.

Under section 301(a) [subsec. (a) of this section] all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 [section 106 of this title] . are governed exclusively by the Federal copyright statute if the works involved are .works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103 [sections 102 and 103 of this title].. All corresponding State laws, whether common law or statutory, are preempted and abrogated…. Section 1338 of title 28, United States Code [section 1338 of Title 28, Judiciary and Judicial Procedure], also makes clear that any action involving rights under the Federal copyright law would come within the exclusive jurisdiction of the Federal courts.

The Copyright Act's preemption provision accomplishes the general federal policy of creating a uniform method for protecting and enforcing certain rights in intellectual property by preempting other claims.  The Fifth Circuit has adopted a two-part preemption test to determine if common law or state law causes of action are preempted by the Copyright Act.

> The courts have interpreted the provision to contain a two-step test. First, the cause of action is examined to determine if it falls "within the subject matter of copyright." Second, the cause of action is examined to determine if it protects rights that are "equivalent" to any of the exclusive rights of a federal copyright, as provided in 17 U.S.C. Sec. 106.

*Daboub vs. Gibbons*, 42 F.3d 285, 288-289 (5th Cir.1995).  Under the so-called

"equivalency test," if the acts of which a plaintiff complains would violate both state law

and copyright law, then the state right is deemed "equivalent to copyright" and thus

preempted.  *Alcatel USA, Inc. v. DGI Technologies, Inc.*, 166 F.3d 772, 788 (5th Cir.

1999).

In *Daboub*, a group called the "Nightcaps" sued Billy Gibbons of Z.Z. Topp for

copyright infringement of their song *Thunderbird*, based upon state law claims for

misappropriation, unfair competition, conversion, and fraud.  The Fifth Circuit

recognized that "[t]he core of each of these state law theories of recovery in this case …

is the same: the wrongful copying, distribution, and performance of the lyrics of

*Thunderbird*."  42 F.3d at 290.  The court held that the plaintiffs could not circumvent the

Copyright Act by disguising copyright claims with state law labels:

> In effect, the Nightcaps have attempted to avoid the Copyright Act by presenting as many state law causes of action to the court as possible. The Nightcaps' argument is like a ventriloquist's attempt to present a copyright action in the voice of state law claims. However, if the language of the act could be so easily circumvented, the preemption provision would be useless, and the policies behind a uniform Copyright statute would be silenced.

*Id.*

Additionally, contrary to Harrell's vociferous argument otherwise, all of the state

law claims asserted by Harrell have been found preempted under the Copyright Act.

Specifically, claims for antitrust violations, misappropriation of trade secrets, and claims

-12-

for unfair competition by misappropriation were preempted in *Alcatel, supra*.  A builder's

Texas law conversion and interference with contract claims against former sales

representatives for allegedly using the builder's architectural plans to build homes were

held preempted in *Gemcraft Homes, Inc. v. Sumurdy*, 688 F.Supp. 289 (E.D. Tex.

1988).  A children's book author's claims against a toy company for unjust enrichment,

*quantum meruit*, and misappropriation were preempted by the Copyright Act, where the

author alleged that the company used his work in competition with the author, depriving

him of profits he would have received.  *McArdle v. Mattel Inc.*, 456 F.Supp.2d 769 (E.D.

Tex. 2006).

The Copyright Act also has been held to preempt a distributor's claim that a

former independent contractor was guilty of conversion because of his use of the

distributor's engineering drawings.  *Taquino v. Teledyne Monarch Rubber*, 893 F.2d

1488 (5th Cir. 1990).  An author's Texas Deceptive Trade Practices Act (DTPA) claim

was held preempted by the Copyright Act where the gravamen of author's complaint

was the wrongful copying of her work and the distribution of her copyrighted book.

*Randolph v. Dimension Films*, 630 F.Supp.2d 741 (S.D. Tex. 2009), reconsideration

denied 634 F.Supp.2d 779.  An architectural and engineering firm's unfair competition

cause of action for misappropriation was preempted by the Copyright Act, where the

firm had to establish same facts for misappropriation action as for copyright

infringement.  *Schuchart & Associates, Professional Engineers, Inc. v. Solo Serve

Corp.*, 540 F.Supp. 928 (W.D. Tex. 1982).

Under the "equivalency test," if the acts of which the plaintiff complains would

violate both state law and copyright law, then the state right is deemed "equivalent to

copyright" and thus preempted.  *Alcatel*, 166 F.3d at 788.  Specifically, the court stated

that:

> The second prong is more complex, however, requiring a comparison of
> the nature of the rights protected under federal copyright law with the
> nature of the state rights for which DSC seeks protection. If these rights
> are determined to be "equivalent," then the state law cause of action is
> preempted. We evaluate the equivalency of rights under what is
> commonly referred to as the "extra element" test. According to this test, if
> the act or acts of DGI about which DSC complains would violate both
> misappropriation law and copyright law, then the state right is deemed
> "equivalent to copyright."

*Id.*

In deciding whether state cause of action is preempted by federal Copyright Act,

courts focus not upon label affixed to state cause of action, but upon what plaintiff seeks

to protect, the theories in which the matter is thought to be protected, and the rights

sought to be enforced.  *Patricia Kennedy & Co., Inc. v. Zam-Cul Enterprises, Inc.*, 830

F.Supp. 53 (D.C. Mass.1993).  As stated above and as the *Daboub* court noted, "The

core of each of these state law theories of recovery in this case, without detailing the

specific elements comprising each claim, is the same: the wrongful copying, distribution,

and performance of the lyrics of *Thunderbird*."  42 F.3d at 290.  The court clearly

recognized copyright claims disguised as state law claims and that the plaintiff's state

law claims would not establish qualitatively different conduct by the defendants than the

elements for an action under the Copyright Act.

In the present case, the plaintiffs cannot allege copyright infringement throughout

each and every count of their Complaint and Amended Complaint and then attempt to

circumvent the Copyright Act by applying state law labels to those claims.  Since all of

the plaintiffs' claims involve allegations of infringement or conversion of "intellectual

properties, including but not limited to trademarks and copyrights," the plaintiffs' state law claims are clearly preempted by the "equivalency test" under the Copyright Act.

It is apparent to the court that the plaintiffs in this case misapprehend the nature of the "equivalency" test under § 301(a) of the Copyright Act.  As the court noted in *Daboub*, the plaintiffs were attempting "to demonstrate how their state law claims [were] not 'equivalent' to a cause of action under the Copyright Act by focussing (sic) on the specific elements of the causes of action they allege." *Id*.  That is exactly what the plaintiffs are attempting here by excruciatingly parsing through each state law claim in an attempt to escape preemption.  Thus, according to the plaintiffs, if one element of a state law claim differs from a Copyright claim, then the state law claim is not preempted.  However, as recognized by the Fifth Circuit, if the preemption provision of § 301(a) was that easily avoided, no state law claim would ever be preempted and the "equivalency test" would be superfluous and meaningless.  Clearly, all of the plaintiffs' alleged state law causes of action are preempted by § 301(a) of the Copyright Act.

As to the specific claims asserted by the plaintiffs, the first is their claim to rights in "certain intellectual properties then in existence, which included … recipes." However, the evidence reveals that these recipes were either published in St. John's cookbooks before either LLC was formed or belong to private labeling companies. Additionally, St. John argues that the recipes are merely compilations of data and are not protected intellectual property.

The seminal case on this issue is *Publications International, Limited v. Meredith Corporation*, 88 F.3d 473 (7th Cir. 1996).  The question before the court was whether the Copyright Act afforded protection to the constituent recipes compiled in a *Danon Yogurt*

cookbook that had a registered compilation copyright.  The court held that a compilation copyright protects the order and manner of the presentation of the compilation's elements, but does not necessarily protect those elements.  *Id.* at 480. Finding that the individual recipes in the cookbook were not protected, the court held that:

> The identification of ingredients necessary for the preparation of each dish is a statement of facts. There is no expressive element in each listing; in other words, the author who wrote down the ingredients for "Curried Turkey and Peanut Salad" was not giving literary expression to his individual creative labors. Instead, he was writing down an idea, namely, the ingredients necessary to the preparation of a particular dish. .[N]o author may copyright facts or ideas….(citation omitted). We do not view the functional listing of ingredients as original within the meaning of the Copyright Act.
> …
>
> The lists of ingredients lack the requisite element of originality and are without the scope of copyright. The Copyright Office itself has stated that "mere listing[s] of ingredients or contents" are not copyrightable. 37 C.F.R. § 202.1.
> …
>
> The DISCOVER DANNON recipes' directions for preparing the assorted dishes fall squarely within the class of subject matter specifically excluded from copyright protection by 17 U.S.C. § 102.

*Id.* at 480-481.

In *Barbour v. Head*, 178 F.Supp.2d 758 (S.D. Tex. 2002) the Texas district court elaborated on the *Publications International* decision, distinguishing recipes that are fact compilations that are not protected and recipes that contain literary expressions that may be sufficiently expressive to exceed mere statements of fact.  Plaintiff Barbour was "the rootin'-tootin' author of *Cowboy Chow*, a Texas-themed cookbook containin' larapin recipes, entertainin' ideas, historical information, and other cowboy fun." *Id.* at 759-760. Subsequently, an internet magazine called *Texas Online*, began publishing virtually

verbatim recipes from *Cowboy Chow* without Barbour's consent.  Barbour sued for copyright infringement, and asserted state law claims for unfair competition through misappropriation and conversion.  The court ruled that where a recipe or formula is accompanied by substantial literary expression it might be copyrightable.  *Id.* at 764. Since the plaintiff's recipes contained various literary anecdotes in addition to the recipes, the court declined to enter summary judgment dismissing the copyright claim.

The evidence in this case shows that St. John's recipes contain no such literary expression.  The recipes are nothing more than a list of ingredients with very basic assembly or preparation instructions.  They are simply not protected under the Copyright Act.  Further, it is apparent to the court that the plaintiffs have abandoned these claims by asserting "It is not necessary for the recipes to be classified as 'Intellectual Properties for success on the merits of Plaintiffs' Federal or State law Claims."

The plaintiffs appear to have now inserted a new Copyright Act claim based upon the MSF Food Product Catalog, the preparation of which was finished by Eileen Harrell. St. John asserts that when alerted by defendants' motion to the "Work for Hire" doctrine, the plaintiffs scurried to get an assignment from her of the rights to the catalog. However, St. John correctly argues that the catalog is merely a compilation and conveys no intellectual property rights in the content not prepared by Eileen Harrell. As stated, a compilation copyright protects the order and manner of the presentation of the compilation's elements, but does not necessarily protect those elements.  *Publications International*, 88 F.3d at 480; *see also Barbour*, 178 F.Supp.2d 758.

St. John next asserts that Harrell has no claim to the food product names

because the names are merely descriptive and not protected intellectual property and there was no written transfer agreement.  It is apparent that the names of the food products that were marketed and sold by RSJ.com were nothing more than descriptive names that St. John had used even before the formation of MSF.  Specifically, the products at issue that were sold by RSJ.com are: *Creole Seasoning, Steak Seasoning, Poultry Seasoning, BBQ Seasoning, Blackening Seasoning, Veggie Seasoning, Hot Sauce, Extra Hot Sauce, Fish Breading, Chicken Breading, Shrimp Breading, Oyster Breading, Bloody Mary Makings, Bloody Mary Rimming Blend, Buttermilk Biscuits* and *My Grandmother's Pancake Mix.*  MSF marketed some of these foods under the *Robert St. John* label and some under the *My South Foods* label.   However, apart from St. John's name, these product names are nothing more than descriptive names that are not protected under the Copyright Act.

The Fifth Circuit rendered a through discussion of the Copyright Act protections afforded to product names in *Zatarain's, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786 (5th Cir. 1983).  Zatarain's is a well-known New Orleans based manufacturer and distributor of a line of food products.  The two products at issue, *Fish-Fri* and *Chick-Fri*, were seasoned corn flour batter mixes used to fry fish and chicken.  Oak Grove later began marketing a fish fry and a chicken fry.  Both products were labeled with Oak Grove's name and emblem, along with the words "FISH FRY" or "CHICKEN FRY."  *Id.* at 788.  At issue was the alleged infringement of the two Zatarain's trademarks, *Fish-Fri* and *Chick-Fri*.

The court recognized that the threshold issue in any action for trademark infringement is whether the word or phrase is initially registerable or protectable.  Courts

and commentators have traditionally divided potential trademarks into four categories that may be classified as (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful.  *Id.* at 790.  The court defined a "generic term" as one that connotes the basic nature of articles or services rather than the more individualized characteristics of a particular product and, as such, generic terms can never attain trademark protection. *Id.*

A "descriptive term" identifies a characteristic or quality of an article or service, such as its color, odor, function, dimensions, or ingredients and ordinarily are not protectable as trademarks.  *Id.*  Whenever a word or phrase conveys an immediate idea of the qualities, characteristics, effect, purpose, or ingredients of a product or service, it is classified as descriptive and cannot be claimed as an exclusive trademark.  *Id.* at 792.  However, the court held that descriptive terms may become valid marks by acquiring a secondary meaning in the minds of the consuming public.  *Id.* at 791.

The court held that descriptive terms can acquire protection:

…if they have acquired a secondary meaning for the consuming public. The concept of secondary meaning recognizes that words with an ordinary and primary meaning of their own "may by long use with a particular product, come to be known by the public as specifically designating that product." (Citation omitted). In order to establish a secondary meaning for a term, a plaintiff "must show that the primary significance of the term in the minds of the consuming public is not the product but the producer." (Citation omitted). The burden of proof to establish secondary meaning rests at all times with the plaintiff; this burden is not an easy one to satisfy, for "[a] high degree of proof is necessary to establish secondary meaning for a descriptive term." (Citation omitted).

*Id.*

As to the burden of proof, the court stated that "[t]he authorities are in agreement that survey evidence is the most direct and persuasive way of establishing secondary

-19-

meaning." *Id.* at 794.

A "suggestive term" suggests, rather than describes, some particular characteristic of the goods or services to which it applies and requires the consumer to exercise the imagination in order to draw a conclusion as to the nature of the goods and services. A suggestive mark is protected without the necessity for proof of secondary meaning. The court used the name "Coppertone" as an example of a suggestive term in regard to sun tanning products. *Id* at 791.

"Arbitrary" or "fanciful" terms bear no relationship to the products or services to which they are applied and are protectable without proof of secondary meaning. The court used the names *Kodak* and *Ivory* as properly classified as fanciful terms for photographic supplies and soap. *Id.*

The court found that there was at least some evidence that the term *Fish-Fri* was descriptive of Zatarain's product in the sense that the words naturally direct attention to the purpose or function of the product. "It simply does not require an exercise of the imagination to deduce that 'Fish-Fri' is used to fry fish." *Id.* at 792-793. In determining whether either product had acquired a secondary meaning, the court held that the evidentiary burden necessary to establish secondary meaning for a descriptive term is substantial. *Id.* at 794. The factors to be considered are:

> Factors such as amount and manner of advertising, volume of sales, and length and manner of use may serve as circumstantial evidence relevant to the issue of secondary meaning. (Citation omitted). While none of these factors alone will prove secondary meaning, in combination they may establish the necessary link in the minds of consumers between a product and its source. It must be remembered, however, that "the question is not the *extent* of the promotional efforts, but their *effectiveness* in altering the meaning of [the term] to the consuming public." (Citation omitted; Emphasis original).

*Id.*

The court held that *Fish-Fri* had indeed acquired a secondary meaning in the New Orleans area due to the fact that Zatarain's produced a market survey and other evidence that showed that over the long period of time it had been selling *Fish-Fri*, the public had associated the descriptive term with Zatarain's in particular.  However, the court held that since the term was still descriptive, Zatarain's had no legal claim to an exclusive right in the original, descriptive sense of the term and therefore Oak Grove was still free to use the words "fish fry" in their ordinary, descriptive sense under the "Fair Use" defense.  *Id.* at 796.  As to the term *Chick-Fri*, the court found that it had acquired no secondary meaning because it had not been on the market very long and there was insufficient proof of a secondary meaning.  *Id.* at 797.

In the present case, there is no doubt that the names *Creole Seasoning, Steak Seasoning, Poultry Seasoning, BBQ Seasoning, Blackening Seasoning, Veggie Seasoning, Hot Sauce, Extra Hot Sauce, Fish Breading, Chicken Breading, Shrimp Breading, Oyster Breading. Bloody Mary Makings, Bloody Mary Rimming Blend, Buttermilk Biscuits* and *My Grandmother's Pancake Mix* are, under the most optimistic scenarios, merely descriptive terms.  The words naturally describe the purpose or function of the products.

The plaintiffs now admit there is nothing unique about the product names and have now conceded they have no claim to food product names.  Further, not only have the plaintiffs admitted that none of these products have acquired any secondary meaning in the market such that the public would identify them with MSF, but they have offered no evidence whatsoever to meet the "substantial" evidentiary burden necessary

to establish a secondary meaning for the descriptive terms.  Indeed, MSF hardly sold any of the products.

St. John next argues that the plaintiffs have no claim to the product labels or logos because they (the plaintiffs) do not own the copyrights to the labels or logos under the "work for hire" doctrine.  St. John points out that throughout this case, the plaintiffs have placed great emphasis on the claim that St. John has misappropriated or infringed upon the product labels and/or logos, describing them as "trade dress."   However, in their Response to the Motion for Summary Judgment, it is difficult to tell what the plaintiffs are claiming.  On the one hand, they assert that the "Work for Hire" doctrine and the Copyright Act are irrelevant because "No where (sic) in the Amended Complaint do Plaintiffs assert ownership of a copyright to the MSF or RSJ trademarks and logos." In the very next paragraph they allege that "Defendants have infringed upon the trademarks of the Plaintiff."

However, the trademarks and logos were created by Joni Dunbar, an independent graphic designer.  It is undisputed that Joni Dunbar was never an employee of any of the plaintiffs.  Furthermore, Eileen Harrell acquired no rights to the trademarks and logos my merely compiling them into a catalog.  Since Joni Dunbar was the author of the works and created them as an independent contractor, she is the owner of the copyrights to the labels and logos.  MSF has no claim of ownership to the labels and/or logos under the "Work for Hire" exception.

It is axiomatic that to prevail on a claim for copyright or trademark infringement, the plaintiffs must prove that they are the legal owners of the works. 17 U.S.C.A. § 201 states that:

   **(a) Initial Ownership**.--Copyright in a work protected under this title vests

initially in the author or authors of the work. The authors of a joint work are coowners of copyright in the work.

**(b) Works Made for Hire**.--In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright. (Emphasis added).

The evidence clearly shows that Joni Dunbar was not an employee of the plaintiffs and thus her work does not fall within the "Work for Hire" exception to the § 201(a) rule that the author of the work is the owner.  While the plaintiffs had the final approval of the work, they did not control the details of the work.  Joni Dunbar was clearly engaged in a distinct occupation or business, e.g., graphic design.  The graphic design work is usually done and, in fact was done, by a specialist without supervision. A great deal of the skill is required in the field of graphic design.  The plaintiffs did not supply the instrumentalities, tools or the place of work for Joni Dunbar.  She was only hired for a finite period of time to work on limited projects.  She was paid by the job. She received no employee benefits nor were taxes withheld from her checks.  None of the parties has ever suggested that they considered her an employee.  She was in her own independent line of business.  *See Community For Creative Non-Violence v. Reid*, 490 U.S. 730 (1989) (applying the common law of agency to determine whether the author of a work was an employee or independent contractor).  Joni Dunbar was an independent contractor and the owner of the trademarks and logos, thus, the plaintiffs have no claim of ownership in them to be infringed upon.

Furthermore, even under the plaintiffs' theories, Harrellco, not the plaintiffs, would be the owner of the trademarks and logos.  Harrellco is the one who paid Joni Dunbar and is not a party to this action.  Accordingly, the plaintiffs' claims are not

brought by the real party in interest (the owner), even if the plaintiffs arguments had merit otherwise, and would be subject to dismissal for this additional reason .

St. John next asserts that the plaintiffs have no infringement claim for the robertstjohn.com website because the plaintiffs do not own the rights to the website and there is no proof of infringement.  The plaintiffs concede that they have asserted no explicit cause of action regarding this issue and the defendants are entitled to summary judgment on it as well.

St. John next contends that the plaintiffs have no claim to St. John's books because he copyrighted them prior to the formation of MSF and there was no written transfer agreement.  Once again, the plaintiffs concede this claim and the defendants are likewise entitled to judgment on this claim.

Finally, St. John argues that there is no evidence of any infringement of the rights of DDU to the "*Eating the South*" television pilot.  It is conceded by all and undisputed that the two television pilot episodes entitled *Robert St. John is Eating the South* were produced and developed by DDU.  It owns the copyrights to the two pilot shows and is entitled to the revenues from those shows if they are ever successfully syndicated.  St. John points out that the problem with the plaintiffs' case is that they cannot demonstrate any proof that St. John has done anything improper with these shows other than trying to market them on behalf of DDU.  Harrell responds that , rsj.com was mentioning the "*Eating the South*" pilots on the website, but that defendants removed the videos from the website after this lawsuit was filed.  St. John admits as much but adds that they were never offered for retail sale.  St. John freely admits that he continues to attempt to market the videos on behalf of DDU.  There is no infringement of rights in that.  The defendants are thus entitled to summary judgment on this issues as with all the others.

IT IS THEREFORE ORDERED AND ADJUDGED that the Motion for Summary Judgment **[#27]** filed on behalf of the defendants, Robert St. John and Robert St. John.com, LLC is granted and the Complaint and Amended Complaint filed herein are dismissed with prejudice.  A separate judgment shall be entered herein in accordance with Rule 58, Federal Rules of Civil Procedure and that all other motions shall be denied as moot.

SO ORDERED AND ADJUDGED this the 31st day of May, 2011.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE